IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:26-MJ-32 |
| JOHN DEAN DAGHITA, | **Filed Under Seal** |
| *Defendant.* | |

## AFFIDAVIT  IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jordan A. Jenkins,  being first duly sworn, state:

### INTRODUCTION  AND  AGENT  BACKGROUND

1.      I make this Affidavit in support of an application for a criminal complaint and arrest warrant for JOHN DEAN DAGHITA.

2.      I am a law enforcement office within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since 2021. I am currently assigned to the FBI's Washington Field Office's complex financial crime squad. I have led investigations involving cryptocurrency fraud, transnational organized crime, securities fraud, investment fraud, money laundering, and cybercrime. I have received training at the FBI Academy in Quantico, Virginia and gained experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrant affidavits and the execution of search warrants. I received extensive training in investigating white-collar crimes and tracing funds generated from illicit activity, including cryptocurrencies, through

1

the international banking system and blockchain technologies. Further, I have obtained certifications from Chainalysis and the Association of Certified Anti-Money Laundering Specialists (ACAMS).

3. I am familiar with the information contained in this Affidavit. This Affidavit is based upon information from several sources, including my personal observations, information provided to me by other law enforcement agents and officers, interviews with victims and witnesses, blockchain analysis, and publicly available information. This Affidavit is offered for the sole purpose of establishing probable cause in support of a criminal complaint against JOHN DEAN DAGHITA (hereafter "DAGHITA") and does not set forth all the facts of this investigation. The legal authorities cited herein have been provided based on review of this affidavit and follow-on discussions with the Assistant United States Attorney assigned to the case.

4. I make this affidavit in support of a criminal complaint charging DAGHITA with one count of theft of government property, in violation of 18 U.S.C. § 641.

## CRYPTOCURRENCY BACKGROUND

5. **Virtual Currency:** Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Different virtual currencies operate on different blockchains, and there are many different widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the BTC blockchain and ETH exists on the Ethereum network. Typically, a virtual currency that is "native" to a particular blockchain cannot be used on a different blockchain. Thus, absent technological solutions those native assets are siloed within a specific blockchain. For instance, ETH (the native token on the

2

Ethereum network) cannot be used on other networks unless it is "wrapped" by contract code. This wrapping process results in what is called Wrapped ETH or WETH.

6.      **Virtual Currency Address:** Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number is represented as a string of letters and Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number is represented as a string of letters and numbers.

7.      **Virtual Currency Wallet:** There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

8.      Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

9.      **Blockchain:** Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address.

10.      **Blockchain Explorer:** These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses

on a particular blockchain. A blockchain explorer is software that uses API[1] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

11.    **Virtual Currency Exchanges (VCEs):** VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously states, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., know-your-customer, or "KYC" checks) and to have anti-money laundering programs in place, to the extent they operate and service customers in the United States.

12.    **Blockchain Analysis:** As previously stated, while the identity of the virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (e.g., the BTC blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (i.e., a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

---

[1] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software.

13.    In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

14.    **Ethereum:** Ethereum is a blockchain platform that supports cryptocurrencies, smart contracts, and the development of decentralized finance applications. Ether ("ETH") is the native token on the Ethereum blockchain. The Ethereum blockchain runs on a network of Ethereum nodes. An Ethereum node is a computer connected to the Ethereum network that keeps record of all transactions made on Ethereum and maintains a complete copy of the Ethereum blockchain. Each Ethereum node communicates with other Ethereum nodes to ensure all respective copies of the blockchain are accurate and up-to-date. The communication enables Ethereum nodes to reach consensus on the final, accurate records and ensure all transactions validated on the blockchain are within the rules defined by the Ethereum network. Anytime the Ethereum blockchain is utilized and a new block is added to the blockchain, every single node on the Ethereum network must process the transaction

## FACTS AND CIRCUMSTANCES

15.    Through my participation in this investigation, including interviews with victims and witnesses and blockchain analysis, I have learned the following facts:

16.    The Asset Forfeiture Program was created in 1984 when Congress passed the Comprehensive Crime Control Act, which provided federal prosecutors and agents the legal means to seize and forfeit the economic benefit of criminal activity. Asset forfeiture plays a critical role in disrupting and dismantling illegal enterprises, depriving criminals of the proceeds of illegal activities,

deterring crime, and restoring property to victims. The effective use of asset forfeiture is an essential component of the Department of Justice's efforts to combat the most sophisticated criminal actors and organizations—including terrorist financiers, cyber criminals, fraudsters, human traffickers, and transnational drug cartels.

17.    The United States Marshals Service ("USMS") is responsible for managing and disposing of most of the property that is seized and forfeited under the authority of 18 U.S.C. § 982 and 21 U.S.C. § 853 including cryptocurrency derived from, or involved in, criminal activity. The USMS manages the distribution of forfeited property and payments to victims of crime connected to those assets, and to state, local, and tribal law enforcement agencies that directly participate in the law enforcement efforts leading to the seizure and forfeiture of assets. Proceeds generated from asset sales are used to operate the program, compensate victims, and support various law enforcement efforts. The USMS Asset Forfeiture Division's Complex Assets Unit (CAU) is currently the primary custodian for all virtual currency seized under the Department's Asset Forfeiture Program.

18.    COMPANY A is a small business based in Haymarket, Virginia, within the Eastern District of Virginia.  In or around October 2024, USMS awarded COMPANY A a managed services contract wherein COMPANY A provided USMS support for Class 2 through Class 4 virtual currency assets. COMPANY A was responsible for taking custody of Class 2 through Class 4 virtual currency assets for storage as well as disposing and liquidating virtual currency assets at the direction of USMS.

19.    In or around January 2025, COMPANY A hired DAGHITA with the title "Cryptocurrency Subject Matter Expert [SME]" to work on the managed services contract with USMS. As the Cryptocurrency SME, DAGHITA was responsible for the handling of virtual assets received from USMS, to include executing virtual currency transfers and swaps in support of liquidations, disposals, and storage.

20.     Starting in or around July 2025, the USMS began sending COMPANY A virtual currency assets to COMPANY A-owned virtual currency addresses with instructions to store, liquidate, or dispose the assets. DAGHITA was the project lead for handling the virtual currency assets received from USMS. COMPANY A employees, including DAGHITA, were required to handle all virtual currency assets using computers located at COMPANY A offices in Arlington, Virginia, within the Eastern District of Virginia.

21.     I learned from COMPANY A the following information about its procedures: Upon receipt of virtual currency assets from USMS, COMPANY A stores virtual currency assets in virtual currency addresses operated and secured by COMPANY A. When USMS requests COMPANY A liquidate virtual currency assets, COMPANY A transfers the assets through decentralized exchanges and services to a COMPANY A centralized exchange account for conversion to United States Dollars (USD). COMPANY A then withdraws USD from the COMPANY A centralized exchange account to a COMPANY A bank account. Finally, COMPANY A sends USMS a corresponding bank wire for the USD balance to complete the liquidation process. DAGHITA is responsible for the execution of virtual currency asset handling, transfer, and storage.

22.     In or around September 2025, DAGHITA was arrested in Arlington County, Virginia on charges of assault and battery of a family member.  DAGHITA's primary residence is in Arlington, Virginia; however, DAGHITA also rents an apartment in New York, New York.

23.     On or about January 23, 2026, FBI was alerted to a series of suspicious virtual currency transactions from United States Government (hereafter "USG") virtual currency addresses. The FBI learned that the USMS owned the virtual currency addresses in question and, as of January 26, 2026, the USMS was missing more than $46 million worth of virtual currency assets that had been transferred to COMPANY A for authorized storage.  The unaccounted-for virtual currency

assets appeared to have been taken from COMPANY A's custody through transactions executed on or about December 15, 2025, January 22, 2026, and January 23, 2026.

24.     On or about January 24, 2026, FBI interviewed the owner of COMPANY A ("Individual 1").  Individual 1 was unaware of the recent virtual currency transfers and confirmed that neither he nor USMS authorized any of the transactions.

25.     The investigation, including a review of publicly available open-source media, interviews with victims and witnesses, and blockchain analysis, show DAGHITA executed a criminal scheme to steal virtual currency from the federal government by leveraging his access, role, and responsibilities as an employed government contractor. These and other actions, discussed in additional detail in this affidavit, provide probable cause to believe DAGHITA stole virtual currency assets from the USG in violation of 18 U.S.C. § 641 (theft of government property).

## UNAUTHORIZED TRANSFERS OF VIRTUAL CURRENCY ASSETS

26.     On or about December 15, 2025, three transfers of virtual currency valued at approximately $5 million were initiated from COMPANY A-owned wallets without authorization from USMS or COMPANY A.  According to USMS, USMS assumed that the transfers were initiated by COMPANY A to further secure the assets. DAGHITA had recently told USMS he needed to move virtual currency to new virtual currency addresses because he deemed it safer to secure assets in their own, multi-signature wallet addresses to avoid comingling assets. In my training and experience, I know that a multi-signature wallet requires multiple signatures, not just one, to execute each transaction.

27.     Accordingly, USMS requested that COMPANY A update their shared portal to reflect where the virtual assets were transferred and confirm the purpose for the transfer. Individual 1 stated that COMPANY A would update the portal, ensure the virtual assets were accounted for, and provide an update from DAGHITA concerning the destination and purpose of the virtual currency transfers.

8

However, in January 2026, the USMS conducted an analysis of virtual currency assets sent to COMPANY A and determined that the December 15, 2025, transfers were still not updated in the portal. USMS also did not receive any explanation from DAGHITA for why the virtual currency was moved.

28.    On January 22, 2026, USMS requested COMPANY A return approximately $2 million worth of virtual currency to a USMS-owned address.  Approximately twenty minutes after the request, USMS observed that the virtual currency was instead transferred to a non USMS-owned address.  USMS asked Individual 1 why the virtual currency was not returned to USMS.  Individual 1 indicated that DAGHITA was responsible for virtual currency transfers and that DAGHITA needed to explain the transfers. The USMS and Individual 1 were unable to get in contact with DAGHITA, and as of January 27, 2026, USMS and COMPANY A are still unable to contact DAGHITA.

29.    In total, 29 unauthorized transfers on December 15, 2025; January 22, 2026; and January 23, 2026, were initiated from COMPANY A-owned addresses. The unauthorized transfers resulted in a loss of more than $46 million to the USG.

30.    The following table summarizes the estimated loss amount to the USG from the theft of virtual currency from COMPANY A virtual currency addresses, based on the value of the assets at closing on the day they were stolen:

| Date | Loss Amount per Transaction |
|---|---|
| 12/15/2025 | $ 702,233.49 |
| 12/15/2025 | $ 4,154,610.37 |
| 12/15/2025 | $ 62,033.43 |
| 1/22/2026 | $ 265,493.45 |
| 1/22/2026 | $ 3,142,216.22 |
| 1/22/2026 | $ 104,110.31 |
| 1/22/2026 | $ 86,031.25 |
| 1/22/2026 | $ 58,787.75 |
| 1/22/2026 | $ 18,283.09 |
| 1/22/2026 | $ 155,223.69 |
| 1/22/2026 | $ 5,699,408.38 |
| 1/22/2026 | $ 6,894.94 |
| 1/22/2026 | $ 306,661.24 |
| 1/22/2026 | $ 191,548.41 |
| 1/22/2026 | $ 916,522.39 |
| 1/22/2026 | $ 39,396.04 |
| 1/22/2026 | $ 6,994.34 |
| 1/22/2026 | $ 18,350.21 |
| 1/22/2026 | $ 822,911.75 |
| 1/22/2026 | $ 578.93 |
| 1/22/2026 | $ 30.69 |
| 1/22/2026 | $ 157,773.12 |
| 1/22/2026 | $ 25,812.85 |
| 1/22/2026 | $ 50,317.94 |
| 1/22/2026 | $ 6,439.96 |
| 1/22/2026 | $ 123,566.81 |
| 1/23/2026 | $ 13,584,975.95 |
| 1/23/2026 | $ 15,395,178.24 |
| 1/23/2026 | $ 12,524.23 |
| **Total** | **$ 46,114,909.46** |

**OPEN-SOURCE MEDIA & BLOCKCHAIN ANALYSIS**

31.     On or about January 23, 2026, FBI accessed publicly available videos posted to X and other online publications capturing a screen share video[2] broadcasted to a group of individuals using

---

[2] A screen share video is a video that captures the screen content of one device and transmits it to another device in real-time. This technology allows users to share their screen, including documents, applications, or individual windows, with others.

Brave Talk.[3] The videos captured the content of the broadcasting individual's computer screen; the contents were shared with individuals in a group chat titled "chinese communist party."

32.    The content of the screen recording included instant messages, Telegram[4] notifications associated with the name "john," transfers of virtual currency from a COMPANY A virtual currency address, and the movement of virtual currency through decentralized virtual currency exchanges.  As discussed further below, I believe the Telegram account with the display name "john" is owned by DAGHITA and the videos captured DAGHITA stealing virtual currency from the USG.

33.    In my training and experience, I know that Telegram users receive notifications on their computer when they receive messages. I also know the notifications show a preview of the message content as well as the sending and receiving parties. As such, the videos capture the screen share from the perspective of the owner of Telegram account, whose display name, "john" (hereinafter, the "John Telegram Account"), is listed as the message recipient in the Telegram notifications in the bottom right-hand corner of the screen. A screenshot depicting the notifications received by the John Telegram Account is included below:

---

[3] Brave Talk is a privacy-focused video conferencing tool used for private calls without requiring users to sign up or provide personal information.

[4] Telegram Messenger, commonly known as Telegram, is an end-to-end encrypted cloud-based, cross-platform, social media and instant messaging service.



34.     Throughout the videos, approximately nine minutes in total, the owner of the John Telegram Account navigated to non-custodial virtual currency wallet software, including Exodus and Coinbase Wallet, to display multiple owned TRON and Ethereum virtual currency addresses, including   TRON   address   TMrWCLMS3ibDbKLcnNYhLggohRuLUSoHJg   (hereinafter,   the "TMrWC Address").

35.     When the owner of the John Telegram Account showed the TMrWC Address, one of the participants in the "chinese communist party" chat posted a photograph of an individual whom DAGHITA's family members subsequently identified as DAGHITA. A screenshot depicting the owner of the John Telegram Account accessing the TMrWC Address and the photograph of DAGHITA is included below:

12



36.     In the video, the owner of the John Telegram Account also navigated to CoW Swap, a decentralized trading platform, and visibly connected the Coinbase Wallet address 0x8924b17fd7512953949de703a7c97484e66e0bec (the "0x892 Address"). Based on conversations with USMS and COMPANY A and a review of records, I know the 0x892 Address is owned by COMPANY A and received USG-owned virtual assets.

37.     Specifically, Blockchain analysis shows that on or about November 20, 2025, the USMS sent COMPANY A, via the 0x892 Address, approximately 1,066 Wrapped Ether ("WETH") belonging to the USG.  The videos then captured the owner of the John Telegram Account using CoW Swap to unwrap the WETH received from the USG and convert to Ether ("ETH"). A screenshot depicting the owner of the John Telegram Account converting the WETH in the 0x892 Address (circled in red) to ETH is included below:

13



38.    In the same video, the owner of the John Telegram Account navigated to Exodus and displayed two virtual currency wallets with a collective balance of $6,200,198.74. One of the Exodus wallets was named "john" (the "John Exodus Wallet") and showed a balance of $3,745,350.39. A screenshot depicting the John Exodus Wallet is included below:



39.     The same video captured the owner of the John Telegram Account and John Exodus Wallet copy the public address for Ethereum address 0xd8bc7ea538c2e9f178a18cc148892ae914a55d08 (the "0xd8b Address"), an address held in the John Exodus Wallet. The video then captured the owner of the John Telegram Account and John Exodus Wallet transfer 1,011 ETH from the 0x892 Address (belonging to COMPANY A) to the 0xd8b Address (belonging to "John") via CoW Swap. A screenshot depicting the transfer of ETH from the 0x892 Address to the 0xd8b Address is included below:



40.    In the video, the owner of the John Telegram Account and John Exodus Wallet then navigated back to Exodus, refreshed the Internet connection, and displayed the updated balance of $9,177,626.94, reflecting the receipt of 1,011 ETH that originated from the USMS and belonged to the USG. A screenshot depicting the updated Exodus balance is included below:

16



## ATTRIBUTION TO THE "JOHN ACCOUNTS"

41.  Throughout the videos, the owner of the John Telegram Account and John Exodus Wallet received Telegram notifications and navigated to owned virtual currency addresses. I have been able to link the John Telegram Account and virtual currency addresses depicted in the videos to DAGHITA.  In turn, and I have identified DAGHITA as the individual sharing his screen in the videos while stealing virtual currency from the USG.

42.  I spoke with DAGHITA's family and friends, who indicated they have communicated with DAGHITA on Telegram using the same "john" alias depicted in the videos. Further, DAGHITA's family and friends informed me that they communicated with DAGHITA using multiple Telegram aliases including "john," "lick," "devil," and "drug." In my training and experience, I know that Telegram users can change their display name and usernames; however, their Telegram ID remains the same.

17

43.     DAGHITA's family members informed me that on or about January 25, 2026, DAGHITA reached out to a family member on Telegram using the aliases "john" and "lick." DAGHITA told the family member to "chill" and that "the feds are watching the channel," referring to a Telegram channel[5] named "lick" (the "Lick Telegram Channel") operated by DAGHITA. According to the family member, DAGHITA immediately deleted the messages. In my training and experience, I know Telegram users can delete messages for both the sender and receiver of the messages.

44.     I viewed the Lick Telegram Channel and messages posted in the channel. I observed multiple messages posted in the Lick Telegram Channel referencing the FBI. For example, as shown below, "lick" posted, "file a report now to help law enforcement catch me" and "yo [NAME] lets make a polymarket[6] right now how many days until I go to jail, UMA vote on when I get posted as captured on fbi.gov":

---

[5] Telegram channels are one-way broadcasting tools designed to send messages, media, and files to unlimited subscribers. Only administrators of Telegram channels can post while subscribers to the channel can read messages and receive notifications.

[6] Polymarket is a decentralized prediction market platform. Users can bet on the outcome of things like elections, product launches, court cases, and other future events.





45.     Through conversations with representatives from USMS and the owner of COMPANY A, I learned that USMS and COMPANY A used multiple virtual currency addresses across various blockchains to send and receive virtual currency. USMS provided FBI with a full list of virtual currency addresses utilized by USMS and COMPANY A, including virtual currency addresses that the owner of the John Telegram Account operated in the videos referenced above.

46.     For example, the videos captured the owner of the John Telegram Account convert WETH in the 0x892 Address to ETH and then send the ETH to the 0xd8b Address. Both the USMS and COMPANY A confirmed to your affiant that the 0x892 Address is owned and operated by COMPANY A, funded by assets owned by the USG including 1,066 WETH, and that DAGHITA has access to the 0x892 Address through his employment. The flow of USG funds to the COMPANY A-controlled 0x892 Address and then to the 0xd8b Address, as captured in the videos, is depicted in the image below:



47.     The videos also demonstrate that the owner of the John Telegram Account is the same person that owns the TMrWC Address. Blockchain analysis shows that the TMrWC Address is primarily funded by multiple virtual currency addresses; the USMS and COMPANY A confirmed to your affiant that the primary funding addresses are operated by COMPANY A and, by extension,

DAGHITA. The flow of USG funds to COMPANY A controlled addresses and then to the TMrWC

Address is depicted in the image below:



48.     Through blockchain analysis and a review of records provided by

USMS and COMPANY A, I have identified virtual currency valued at more than $46 million missing

from COMPANY A-owned virtual currency addresses. From December 15, 2025, through January

23, 2026, approximately 29 unauthorized transfers were initiated from COMPANY A-owned wallets

resulting in the loss of USG virtual currency valued at approximately $46,114,909.46USD.

49.     As of January 27, 2026, DAGHITA has not responded to USMS or COMPANY A

nor has DAGHITA returned the funds. Subsequent attempts by family, friends, and law enforcement

to contact or locate DAGHITA have failed.

50.     Based on the foregoing information, I believe that DAGHITA is the owner of the John

Telegram Account and John Exodus Wallet, and in turn is the individual sharing his screen captured

in the video discussed in this affidavit. Accordingly, I believe that DAGHITA, using his access to

USG property as a government contractor, stole virtual currency from the USG from multiple

occasions, even after receiving directions from USMS to return the virtual currency assets after the

initial December 15, 2025, transfers. I believe DAGHITA transferred the assets to virtual currency addresses held solely in his possession for personal use, resulting in a loss to the USG of over $46 million.

## CONCLUSION

51.     Based on the foregoing, there is probable cause to believe that, beginning no later than November 2025 and continuing through the present, in the Eastern District of Virginia and elsewhere, JOHN DEAN DAGHITA embezzled, stole, and knowingly converted to his use or the use of another any money, or thing of value of the United States or of any department or agency thereof—to wit, more than $46 million in virtual currency assets—in violation of Title 18, United States Code, Section 641.

52.     I therefore respectfully request an arrest warrant authorizing the arrest of DAGHITA.

Respectfully submitted,

*Jordan Jenkins*

Jordan A. Jenkins
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on January 30, 2026.

*William C. Fitzpatrick*

The Honorable William C. Fitzpatrick
United States Magistrate Judge

22